IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 20-cr-00087-RBJ

UNITED STATES OF AMERICA,

       Plaintiff,

v.

TIMOTHY HUMMEL,

       Defendant.

---

## MOTION FOR BELOW-GUIDELINE SENTENCE

---

The defendant, Timothy Hummel ("Mr. Hummel"), by and through undersigned counsel, David E. Johnson, hereby files this Motion for a Below-Guideline Sentence, requesting the same sentence as that recommended by the Probation Office in the Presentence Report (Doc. 27 ("PSR")): Time Served followed by three years of supervised release, including the three special conditions in the PSR.  In support thereof, Mr. Hummel states as follows:

### INTRODUCTION

Mr. Hummel's experience in this case has been consequential. Despite an abusive childhood, he is being sentenced for his first criminal offense of any kind, and has now suffered a felony conviction as a result of this case.  He is not a danger to the community. The offense was committed as a form of coping mechanism, during a time when Mr. Hummel was not under the care of a therapist or counselor.  That has since changed.  Further, Mr. Hummel's interview with law enforcement evidence a respect for the law. He was cooperative. He accepted responsibility immediately. Mr. Hummel feels

shame and remorse for his conduct. Section 3553(a) does not require additional imprisonment.

The Guideline range of 10 to 16 months, *see* PSR at ¶ 74, is merely advisory, *United States v. Booker*, 543 U.S. 220 (2005), and the range of sentencing options is broad.  *See, e.g., Spears v. United States*, 555 U.S. 261 (2009); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Rita v. United States*, 551 U.S. 338 (2007).  This Court may not presume that a within-Guideline sentence is appropriate, *Rita*, 551 U.S. at 351, nor may it put its "thumb on the scales" in favor of a Guideline sentence, *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring). A district court must "give respectful consideration to the Guidelines" but is permitted "to tailor the sentence in light of other statutory concerns as well."  *Kimbrough*, 552 U.S. at 101 (internal quotations omitted).

After calculating and considering the advice of the Guidelines, this Court must turn to an "individualized assessment" of him and his case "based on the facts presented."  *Gall*, 552 U.S. at 50. When making these individualized assessments, sentencing courts are free to categorically disagree with the Guidelines, and may impose a different sentence based upon a contrary view of what is appropriate under Section 3553(a). This includes the freedom to merely disagree with a guideline's computations, and the "policy decisions" that are contained in the current guideline. *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011) (holding that, post-*Booker*, a sentencing court may impose a non-guideline sentence based on a disagreement with the Commission's views); *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (courts may vary from guidelines based solely on categorical disagreements with the Commission's Guideline).

**ARGUMENT**

In this case, a below-guideline sentence should be imposed. The sentence that best complies with Section 3553(a) is a <u>time served</u> sentence, to be followed by a three year term of supervision.  The Probation Office has similarly recommended a time served sentence. *See* PSR at R-1. The government has asked for a sentence of supervised probation. *See* Doc. 31.  In essence, an additional imprisonment term is not warranted in this case.

**I.     History and Characteristics of Mr. Hummel**

**A.     Childhood; Boy's Ranch.**

Mr. Hummel's childhood in Texas was "pretty terrible".  PSR at ¶¶ 53-54.  His father had untreated mental health issues, and his mother was not protective of his father's behavior. *Id.* at ¶ 53. In a letter to this Court, Mr. Hummel's brother describes that their mother "was powerless" to stop their father, who was "severely abusive in every way imaginable."  Mr. Hummel similarly recalls experiencing physical and verbal abuse, describing his dad to the Probation Office as "incredibly abusive".  Mr. Hummel's extended family members described his father to the Probation Office as "verbally abusive and very controlling"; the family feared his retaliation if they spoke up. *Id.*

Mr. Hummel's father is currently incarcerated with a release date in 2033, although he is currently eligible for parole (something Mr. Hummel learned while reviewing the PSR in this case). Mr. Hummel has always lived in fear of his father getting out of prison and trying to contact him.

In order to get away from his home situation, at the age of 13, Mr. Hummel voluntarily went to reside at the Boy's Ranch in Texas. He did so *not* as a result of court intervention or because of a criminal justice case. He stayed at the Ranch until age 18.

In May 2012, while at the Ranch, Mr. Hummel earned his high school diploma, as verified by his high school transcript.  According to the transcript, he earned a GPA of 3.644.

According to Mr. Hummel's uncle, Mr. Hummel "was always involved in all aspects of life on the Ranch."  This was echoed by Mr. Hummel's therapist and case worker at the ranch: "He was seen as a leader, was a good student and band member." "He was seen as trustworthy, responsible and very caring towards others," and to the letter-writer's knowledge, Mr. Hummel "never showed any violent tendencies towards others, never fought with other boys, nor made any threats of physical harm to others."

A downward variance is warranted to account for Mr. Hummel's childhood and his subsequent ability to excel at the Boy's Ranch. *See United States v. Lovato*, 798 F. Supp. 2d 1257 (D.N.M. 2011).  In *Lovato*, the District Court varied downward to 5 years probation with 8 months of home confinement based, in part, on a "traumatic childhood." *Id.* at 1259. The Court explained that the defendant suffered from some mental health issues, was abandoned by her mother, abused by her father, and then spent time in a foster home at 12 years old.  *Id.* at 1260.  "The Court believes these circumstances . . . warrant a variance from the advisory sentencing guideline sentence to a range that is equivalent to one with an adjusted offense level reduction of three levels." *Id.* at 1260.[1] *See also United States v. McBride*, 511 F.3d 1293, 1297-98 (11th Cir. 2007) (rejecting Government's argument that variance based on childhood abuse was substantively unreasonable.); *United States v. Brown*, 985 F.2d 478, 481 (9th Cir. 1993) (reversing

---

[1]  A three-level variance in this case would result in a guideline range of 4 to 10 months, in Zone B of the Table, which, even under the Guidelines, would permit a sentence of probation and home confinement.

4

the sentence imposed because the court failed to consider "the abuse a defendant had suffered during childhood constituted a valid ground for departure").

### B.   Lack of Criminal History; Zero Criminal History Points

Unlike many people who suffer abuse as a child and have to reside away from family, Mr. Hummel did not resort to criminal activity.  Not only is Mr. Hummel in the Guideline's criminal history category I ("CHC I"), but the PSR, in fact, assigns him zero criminal history points. PSR at ¶¶ 48, 49.  And not only does he have zero criminal history points, but the PSR demonstrates no prior criminal convictions. *Id.* at ¶¶ 46, 47.

The Guidelines, however, do not account for this. For example, a defendant could have a prior felony conviction and still be in CHC I.[2]  A defendant could also have numerous prior misdemeanor convictions and still have zero criminal history points.[3] Mr. Hummel is none of those. He has no prior convictions. Yet the guidelines do not account for that, instead just grouping Mr. Hummel generally into CHC I.

A downward variance is warranted under these circumstances. The Sentencing Commission has recognized that first-time offenders are even less likely to reoffend than defendants with a limited criminal history who also fall within CHC I. *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004);[4]  U.S.S.C., Recidivism and the "First Offender", at 13-14 (May 2004).[5]

---

[2]   For example, zero or one criminal history points would be assigned to a prior felony if the sentence for that felony was probation, suspended imprisonment, less than 60 days confinement, or aged.

[3]   For example, if the misdemeanor was an offense listed in § 4A1.2(c) or aged.

[4]  *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf

[5] *Available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

The Sentencing Commission's research has found that defendants with zero criminal history points have a recidivism rate of just 11.7%, while those with just one criminal history point have double the recidivism rate at 22.6%. First Offender Report at 13-14.  Furthermore, defendants who have no prior arrests (Group A in the Report) have the lowest recidivism rate at 6.8%, or a re-conviction recidivism rate of only 2.5%. Id. at 14 & n.28.

Despite these clear and compelling findings, the Guidelines have not been revised to take a defendant's lack of prior conviction and/or lack of any criminal history points into account. A growing number of courts have taken such circumstances into account when fashioning an appropriate sentence under Section 3553(a).[6] A below-guideline sentence should be imposed.

## C.     Employment Record; Relationship; Stability

Mr. Hummel's history also evidences an ability to maintain employment and live a stable lifestyle.  An imprisonment sentence in this case would disrupt that stability and do more harm than good.

As it relates to employment, Mr. Hummel has always worked. His first job was at age 16. He also worked at the Boy's Ranch. From 2013 to 2015, after leaving the Ranch, Mr. Hummel worked various restaurant jobs.  In 2015, Mr. Hummel met his

---

[6]     See, e.g., United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate" than all other offenders); United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – i.e., the charged – act); United States v. Hamilton, 2009 WL 995576, at *3 (2d Cir. Apr. 19, 2009) (holding that "the district court abused its discretion in not taking into account policy considerations with regard to recidivism not included in the Guidelines").

current fiancé in Texas.  In September 2015, when Mr. Hummel was 21 years old, the couple moved to Colorado. Once in Colorado, he obtained stable, long-term employment until his arrest in this case.

From September 2015 to March 2017, he worked for a construction company as a General Laborer. PSR at ¶ 66.  For over three-and-a-half years now (since March 2017), Mr. Hummel has been employed at the same landscape company.  He is currently an irrigation technician. PSR a ¶ 65. His employer is aware of the current case. They remain supportive. In fact, two letters have been provided to this Court from Mr. Hummel's current supervisors, speaking volumes about Mr. Hummel's character and value to the company. The owner of the company described Mr. Hummel as someone who has been a "key employee"; "It is difficult to express the value of having someone like [Mr. Hummel] on the team." As it relates to the instant case, he explained: "There was never any part of him that tried to hide from what he had done or the consequences of his actions."  The Vice President of the company similarly stated: "I fully support Timothy Hummel and ask you to do so as well."  He described Mr. Hummel as "extremely dependable, kind, smart, hardworking, gentle and overall likable," and said he was "dumbfounded" by Mr. Hummel's conduct in this case. "He told me he was dumb, and never had any intention to act on any of the things he said. I believed him then and I believe him as I write you this letter."

In January 2020, Mr. Hummel proposed to his partner, and she accepted. She is aware of the current case.  Although the case initially put a stress on them, their relationship is currently strong and doing well.  In a letter to this Court, she described Mr. Hummel as "actively learning from and working on" not making past mistakes again. Mr. Hummel's aunt told the Probation Office that she supports the couple's relationship,

adding it "adds stability to [Mr. Hummel]'s life."  PSR at ¶ 55.  Mr. Hummel's uncle wrote

to this Court: "In his relationship with [his fiancé] we have perceived a continuing

maturity and feel that [Mr. Hummel] is growing into a promising, responsible adult."

## II.   Nature and Circumstances of the Offense

### A.   The Instant Offense.

In August 2019, Mr. Hummel sent three threatening voicemails and one

threatening email to the ERO of ICE.[7] His conduct was serious and threatening. It was

also unsophisticated. The phone number was to a general number for Denver's ICE

Field Office, and the email address was a general Denver Outreach email for ICE.  Both

the phone number and the email address were listed on ICE's website in a "Contact"

section. Mr. Hummel had no individual target in leaving the messages. He gathered the

contact information through a simple Google search.

Nor did Mr. Hummel attempt to hide who he was.  He used his own email

address (which contained his name).  He called from a phone number readily

associated with him.

Law enforcement began investigating the communications, and a bulletin was

issued to alert officers should they encounter Mr. Hummel. None ever did.  Instead, in

January 2020, law enforcement (FBI) contacted Mr. Hummel at his job and asked if he

would consent to an interview.  He agreed and appeared on his own volition.

Mr. Hummel explained he had "zero intention" of following through on any threat,

and that he made them when he was "struggling." He described the communications as

sort of a coping mechanism when he was upset or having a bad day. *See* PSR at ¶ 31.

---

[7]  Specifically, the Enforcement and Removal Operations (ERO) of U.S. Immigration and Customs Enforcement (ICE).

He repeatedly apologized and expressed remorse. As the government explained: "the FBI found no evidence that the defendant intended to act on his threats or that he took any steps or preparation towards doing so. When the FBI approached the defendant, he immediately acknowledged his conduct and expressed regret." Doc. 31 at 3.

Not only did Mr. Hummel answer the agent's questions and accept responsibility, he did even more. First, during the interview, without prompting, Mr. Hummel informed law enforcement that he had sent other emails prior to August 2019. He volunteered the information without even being asked about it. "There were emails before then," he spontaneously informed.[8] He wanted to be completely forthcoming with nothing to hide. Second, even *after* the interview ended, Mr. Hummel called the agent to provide additional information. *See* PSR at ¶ 32. He demonstrated a respect for their investigation.

### B.    Compliance with Bond

Mr. Hummel has been on bond in this case since March 13, 2020. He has been compliant with his bond conditions. PSR at ¶ 5. This includes refraining from marijuana. Although Mr. Hummel previously used marijuana daily, his last use was on the morning of his arrest. *Id.* at ¶ 62. Abiding by the Court's direction, his urinalyses have been negative for controlled substances. He is demonstrating respect for this Court.

### C.    Mental Health

Mr. Hummel had not had the benefit of counseling since he left the Boy's Ranch in Texas. That has since changed after Mr. Hummel's arrest for the instant offense.

---

[8] The emails had been sent in July 2018. Law enforcement first learned about those previous emails in November 2019. Upon investigation, it was learned that those 2018 emails were identified as "spam" and directed to the "junk mailbox."

When Mr. Hummel first arrived at the Boy's Ranch, he was early-on diagnosed with bipolar disorder. As time went on, other diagnoses became the focus of his treatment, including PTSD, anxiety and depression.  *See* PSR at ¶ 60.

Since his arrest in this case, Mr. Hummel participated in weekly individual dual diagnosis therapy "to address anger, trauma, and self-medication." PSR at ¶ 61. As of early-September 2020, Mr. Hummel attended 18 therapy sessions. *Id.* In a letter to this Court, Mr. Hummel's counselor explained the work and progress Mr. Hummel has made in counseling: "Mr. Hummel has struck me as an honest and accountable young man who displays healthy self-awareness and insight. . . . Mr. Hummel appears to have developed a greater capacity to experience and process emotions, which further improves his ability to respond appropriately in different situations."  Doc. 27-2 at 3.

Importantly, the letter explains how Mr. Hummel's mental health (and lack of participating in therapy at the time) likely contributed to the instant offense.

> Mr. Hummel has remarked on multiple occasions that he likely would not have found himself in his current situation had he entered therapy and addressed his anger sooner. I find myself in agreement with this statement. . . . It is of my professional opinion that through continued therapy, Mr. Hummel will be able to further develop the healthy coping and cognitive skills needed to be successful long-term.

Doc. 27-2 at 3. Mr. Hummel's fiancé writes to this Court a similar sentiment:

> Mr. Hummel is currently in therapy and I feel that has helped him immensely with how he handles his anger when it does come up. He is constantly trying to do better and simply be a better person than he has been previously. His growth has been a truly amazing thing to watch, and help, as his spouse.

For his part, Mr. Hummel explained to the Probation Officer that he wishes he had sought out therapy sooner. He is committed to continuing the progress he made. Under these circumstances, an additional imprisonment term is not necessary. A below-

guideline departure or variance is warranted. See U.S.S.G. § 5H1.3 ("Mental and Emotional Conditions").

### C.     Remorse

Finally, incorporated herein in their entirety are the numerous letters of support written on behalf of Mr. Hummel – two from mental health professionals, two from employers, three from family (*i.e.* uncle, brother, and fiancé), and two from friends.[9] One letter-writer expressed how she observed Mr. Hummel "to be humble, regretful, and embarrassed when he shared" about his conduct in this case with her.

Mr. Hummel agrees.  He wishes to express the regret he has concerning his conduct. He is now a convicted felon – something that was not true before this case. He has now slept a night in a jail – again, something that was not true before this case. When he reads the contents of his communications, he is ashamed. He is not proud of himself. However, he also recognizes that he is now "in a different place, mentally" than he was when the communications were sent. It's a "much better place," and for that Mr. Hummel is thankful.

### CONCLUSION

WHEREFORE, after considering the history and characteristics of Mr. Hummel and the nature and circumstances of this case, this Court should impose a sentence of <u>time served</u>, followed by three years of supervised release. 18 U.S.C. § 3553(a)(1).

Under the facts presented here, a higher sentence would be greater than necessary (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

---

[9]   Consistent with the local rule, undersigned counsel has provided all nine letters to the Probation Office for filing with this Court.

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2). In these unique circumstances, such a sentence would not be an "unwarranted sentence disparit[y]" among defendants with zero criminal history points, who have been found guilty in similar circumstances.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender

s/ David E. Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
Attorney for Defendant

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 13, 2020, I filed the foregoing **MOTION FOR BELOW-GUIDELINE SENTENCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

Julia K. Martinez, Assistant United States Attorney
E-mail:  julia.martinez@usdoj.gov

I hereby certify that I have mailed or served the document or paper to the following participant in the manner (mail, hand-delivery, etc.) indicated next to the participant's name:

Timothy Hummel (via U.S. mail)

s/ David E, Johnson
DAVID E. JOHNSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
David_johnson@fd.org
Attorney for Defendant